Please be seated. 3-7-2-0-1-2-4, the people of the state of Illinois, appellee by Nicholas Atwood v. Jackie Lee Williams, appellant by Karen Ramos. Before you start, Justice Litton is the third judge on this panel. He's not going to be able to listen to the argument this morning, but he will have it available to him by recording, and he will be participating in the decision. So, Ms. Ramos, good morning. May it please the Court, good morning. Good morning, Counsel. My name is Karen Ramos on behalf of Jackie Williams. I realize in our brief we filed, I believe, seven issues. I just wanted to bring a couple of things to the Court's attention this morning and then answer any questions you may have, of course. One of the issues that we brought before the Court was that one of the witnesses, Mr. Spencer, had been called to testify. He was a co-defendant on the case. He had been also convicted of the murder. He had been called to testify. There was numerous issues with getting him to cooperate. First, he said he wasn't going to testify because he felt threatened, and then he was upset because he was going to be held in contempt. He was brought off and on the stand. One of the things he tried to claim was a Fifth Amendment privilege not to answer any questions. There was obviously some back and forth about whether or not he even had a privilege at the time. The State, in its brief, did mention that someone can't argue for a constitutional right for someone else, which is true. We are not raising Sperry's constitutional right not to testify based on his Fifth Amendment privilege. Mr. Sperry was the witness, the co-defendant who was also called as a witness by the State. Spencer. Spencer, sorry. Did I say Sperry? Yes. So he was, one of his ways of trying to, I believe, get out of testifying. There's another person, co-defendant Shelton, as well. Yes, I mean Spencer. So you're focusing only on Spencer. Correct. And there is no Sperry. There is no Sperry. Sorry, that was an early morning issue. Spencer, we're dealing with. So amongst ways of him trying to get, I believe, to get out of testifying because I don't know why. First he said he felt threatened and then he was going to be held in contempt. And then he tried to claim a Fifth Amendment privilege. Okay? And, you know, the judge acknowledged that, you know, while there's no limits on possible innocence claims, you know, at some point you have to be able to say, no, you know, you've been subpoenaed and you have to testify. I did include that in my brief. The State, in its reply, mentioned that a defendant cannot raise a constitutional claim for someone else, which is true. This is not what we are trying to raise to the Court's attention. What we are trying to raise to the Court's attention is that after being informed he couldn't assert this Fifth Amendment privilege, after the Court said, no, Mr. Spencer, you must testify, Spencer refused to answer any meaningful questions. He didn't answer at all. He would just sit there. And after, over the defendant's continuing objection, the State was allowed, of course, to read into the Court and before the jury the testimony from Mr. Spencer's own trial. Okay? So, basically, all of this testimony is coming in from Mr. Spencer's trial over defense objections. The jury is hearing it and Mr. Spencer himself is not saying anything. That also leads to the fact that then there was no meaningful cross-examination. Mr. Spencer wasn't saying anything. Defense counsel didn't have a chance to say, well, is this true that what you said is, you know, were you lying then? Are you lying now? What happened back then? Mr. Spencer wasn't saying anything. Wasn't he cross-examined during his own trial? Yes. I'm sure he was. But the cross-examination So his veracity was tested on the record in his prior trial. I would say his veracity was tested at his trial regarding what he was saying, but I also believe he I'm sorry, I lost my train of thought. You were arguing he hadn't been cross-examined in Mr. Williams' trial. Yes. So the focus of what happened in his trial may not have been the same as the focus in what was happening in Mr. Williams' trial. At what point was it that Spencer testified that when he testified at his own trial, all he was trying to do was clear himself? That did come up, I believe That was in this trial? That did come up in this trial. And was it on cross-examination? I believe it was on cross-examination. And was that before or after the state brought in the transcript from the trial? I believe it was actually kind of in the middle. I think he just, while it was going on, I believe, if I remember correctly, he said, Well, I just said all that because I was trying to help myself. And that was on cross-examination? I'm trying to remember if it was on cross-examination or if it was during the reading of his testimony in by the state. I'm sorry, I don't remember exactly. But at some point he testified, the gist of his testimony was that you can't believe what I said in my testimony at trial because all I was trying to do was shift the blame to somebody else. That's correct. But I would also say, and that's important. I was going to get to that. That was important for the jury to hear. But I would also say the jury heard that one sentence versus, I would say, minutes upon minutes of the actual testimony that he did give from his trial. So we're hearing one sentence saying, Oh, I just made all that up to help myself, versus all of this testimony that's coming and the jury's hearing it over and over and over again. I think it may have been a bit prejudicial in that sense. I would also say the inferences from a witness's refusal to answer, those pauses, those I don't remember, those I just refuse to cooperate, they have an impact on the jury, and that should also be considered. Like I said, yes, he did say, I made all this up to help myself. But like I said, the jury heard a lot of his testimony over and over and over again. They heard him not saying anything. They heard him not refuting anything except for once. And I think that that did stick in the jury's head in this case. I believe the only other issue I directly wanted to bring before the Court was that we did raise an issue about, I'm sorry, in Chicago, we call them young adult sentencing issues, whereas he was 21 years old and the brain science going towards possible sentencing issues. I did want to acknowledge that there's been some recent case law. The one off the top of my head is People v. Cordell-Williams that came out of the First District, where it said that you have to basically have the brain science apply to the individual in order for it to be considered, and basically, like People v. Harris said, develop the record. I would say I acknowledge that we don't have so much of that record at this point because it is being raised on direct appeal as opposed to, say, a post-conviction where you have been able to develop that record, bring in his records, and possibly have him examined by a psychologist. I would say another possible way for us to develop that record is if he was to be allowed to develop it in a possible sentencing hearing. Okay. You have a question. I do have a question, but I don't want to interrupt you. No, that's okay. Go ahead. I'm getting old, and I don't always hear the way I should. I thought I heard you say that you have raised seven issues. Did you say several or seven? I think I said several. Several. Several. I just want to make sure I understand what issues you have raised because, honestly, the brief was a little hard for me to follow. I'm sorry.  It's okay. It's why they pay us a lot of money. So the first issue is a reasonable doubt issue. Correct. The second issue you identify in your brief goes to this prior sworn statement of a co-defendant under oath. And the third issue is the sentencing issue you've mentioned. There was a supplemental brief that was filed that included a few more issues. Okay. Tell me. Obviously, I am missing. Okay. Tell me what those additional issues are just to make sure I give them to you correctly. So the first issue was the reasonable doubt issue, especially with the two non-accomplice witnesses, the testimony of the accomplices and no physical evidence. That was the first issue. The second one was the evidence presented for the charge of armed robbery was insufficient to sustain a finding of guilty. The third one was whether the court committed reversible error in allowing the evidence, the prior evidence of DeMarco Spencer, which is what I just went over. The fourth regarded the court preventing certain testimony from a witness named Millie Griffin as to my vote. I'm sorry, the motive and bias of DeMarco Spencer. The fifth issue was whether the judge erred when he inquired about prejudicial evidence that was deemed inadmissible in the prior appellate. I appreciate you clarifying that. Okay. I obviously have more homework to do. I do know that the state addressed those additional issues in advance, so I appreciate that very much. However, in preparing here today, I did read the record. Perhaps I didn't read the supplemental brief, which isn't in my file, but I did read the record. And the state, the grounds for admitting the prior sworn testimony of Mr. Spencer was based on the Code of Criminal Procedure. But you don't discuss Chapter 725 ILCS 5-115-10.2 in your brief, at least the brief that I read, because that was the basis to admit the testimony. And it's clear from the record that there was some discussion in chambers with the judge with regard to that statutory basis. So here's my question. 725 ILCS 5-115-10.2 subsection E talks about allowing these prior statements when a witness refuses to testify. That statutory section applies to these facts where a witness refuses to testify in spite of a court order to do so. The impeachment still of a prior statement is unaffected by this rule. If the judge under subparagraph E of that statutory section could have allowed the statement in as impeachment by statute, how can we find the judge abused his or her discretion? I believe I remember working on part of that actually when I was working on my brief. Please give me a moment just to remember what I was working on back then, because I remember reading the statute and I remember going through that thought process as well. I understand the brief that I read was written in July of 2018, so I understand why your memory may be a little foggy. But do you understand my point that if the judge was allowed to consider or allow the jury to consider a prior statement of a witness who is refusing to testify as impeachment, then I have a hard time finding that the child judge abused his or her discretion when our lawmakers have said that's allowed. Can you just, you know, off the cuff and I'm catching you off guard. It's okay. My initial thought was, is obviously the legislature has those rules delineated for a reason. And in most cases, people not wanting to testify using prior statements for impeachment happens every day, obviously. But I also think that there's a point where some things may have a prejudicial effect that may affect someone's fair trial to a point. So it almost kind of goes to almost a constitutional issue where at one point, yes, it's impeachment and it's proper impeachment. But at what point does it become prejudicial to the defendant to have all of this stuff constantly read into the record and not being able to bring up your side of it? Because while it's maybe not direct testimony, it's impeachment. And how do you impeach that impeachment if you don't have the person's cooperation? It's almost where my thoughts are. I appreciate it. Thank you for answering my question. I have a question with regard to the age issue, the last issue that you raised. Yes. In Harris, as I understand it, our Supreme Court, not the U.S. Supreme Court, said that the determination of 18 as the cutoff age was arbitrary. And they declined in Harris to extend it to the group of people who were 18 to 21, which seems to cast doubt on the validity, the continuing validity of House. So how do we reach your issue with regard to Mr. Williams, who was 21 at the time he committed the crime, allegedly? Well, I guess he's convicted. He's convicted. Well, first, I would say that in the Harris case, it was a full-out constitutional challenge as to whether someone has to be 18 or if they could be older. Whereas in this case, we're trying to do an as-applied challenge, which is slightly different. We're saying that the constitutional violation happened as applied to him rather than to all 21-year-olds as a whole, which is slightly different than what happened in the Harris case. Also, the difference would be that we're not saying that all 21-year-olds obviously can't be held criminally negligent or what have you or have to be considered. But we're saying that there is science out there, science that has been accepted at numerous levels of the court system in the United States that says someone who is 18 to almost 24, from an expert that I've been speaking with, Dr. James Garbarino, said that your brain can be immature up to that age. And also factors that you live with. Is this in the record? I'm sorry. I was just trying to answer her question. Are you relying on Dr. James Garbarino? Because it's part of the case. No, it's actually part of – some of it's in the cases that I cited. It's in Buffer. It's in – yeah. It's in Buffer. It's in Reyes. It's in Sanders. That's fine. We can consider that. Okay. So factors that impact you at an age impair your maturity even more. So if you were – from what I understand, if you were impacted by domestic violence in your life or violence in your neighborhood or having a low IQ or you started drugs or alcohol earlier, that impedes your maturity even more. So from what I understand of the state of the law, dealing with not only Harris, but like I said, the case of Fort O'Williams, which I understand is a First District case, that creating a record to show the court that someone's brain maturity is not as far along as their chronological age would show should be considered at sentencing and almost – and be considered a juvenile in terms of sentencing only. So that the Miller factors looking at all of his attendant characteristics should be considered. So like I said, it's not necessarily that we're saying all 21-year-olds should be considered juveniles and be resentenced and what have you. We're saying as applied to this client, this defendant, Mr. Williams himself, he should be considered closer to a juvenile than an adult. And we do acknowledge that we don't necessarily have that record created to show that yet. Thank you. Mr. Atwood. Good morning. Good morning. May it please the Court. Counsel. My name is Nicholas Atwood and I represent the people of the state of Illinois in this matter. I guess I'll start by focusing on the two issues that counsel raised. The brief did have seven issues. I think I wrote a 50-page brief in this one, so there's a lot more that we can really cover in 15 minutes. With regard to the brain science issue, I think that, you know, Harris has basically spoken on this issue. And society has drawn a line at 18 years of age for considering an individual an adult. As this Court's noted, the defendant was 21 years old when he committed this crime and, in fact, was only 60 days removed from a prior state of imprisonment when he was still on parole when he committed this crime. I don't think that the brain science when we're discussing juveniles is really applicable to a 21-year-old adult in this case. And I realize counsel's side of the case, Cordell Williams, that was not initially in the briefing. So if your honors would like, I'd like to supplement that if necessary, if you determine that you would like further briefing on that issue, because I've not read that case. I'm not familiar with what that says. In addition, the second house case has recently come out. And I know counsel made a brief reference to the second case with House. I think that case is probably due to be reversed once it gets appealed, because it seems pretty clear that despite the fact that the defendant was a 19-year-old in that case, that despite the supervisory order from Pete Willoughby Harris, the first district and House essentially came up with the same conclusion again, even though Harris, you know, in very certain terms outlined 18 is the age that we cut these off, not 19 and 2 months and certainly not 20. So I think, you know, in the interest of spare deceases, I think the court is bound to follow Harris on this issue. With regard to the... Excuse me. You read Harris then as not allowing for any additional argument for the particulars of the defendant? I know counsel's couched this as an as-applied challenge. I didn't read it as an as-applied challenge in the initial brief, but I think either as a facial situation or as an as-applied challenge. I think the rule is the same. I feel like the language is very clear in Harris. An adult is an 18-year-old. Anything above that, we're not considering these youth in attendance circumstances, which is what the whole point of those juvenile cases were. They were focused on 16-year-olds being given sentences that amounted to de facto life sentences, even though they weren't necessarily sentenced to life imprisonment. That's just not what we have here. So under a facial or under an as-applied challenge, this defendant was 21 years old when he committed this crime. It's just not applicable to the facts of this case. But I do read Harris as drawing a line for all constitutional claims as applied or otherwise. 18 is the age of majority. Society has deemed 18-year-olds as adult, and that's how the court's going to apply it. Whether that means 18 in a day or 18 in six months, I don't know. That's a different fact set than we have here. What we have here is a defendant who's three years beyond that age. With regard to the confrontation issues with DeMarco Spencer, as Justice Wright pointed out, there is that provision in the code about impeaching a witness who refuses to testify. We didn't raise that particular issue in our brief. We really just responded to the issue that was raised, and the issue that was raised in the defendant's brief had to do with laying the proper foundation for the admission of that testimony. And in this case, this isn't a situation where the— If I'm not mistaken, and again, I have not read the supplemental brief, but I believe in the initial brief, reliance was on evidentiary rule 901, and the foundation was challenged based on authentication and identification. That's correct. That's what the original argument was, and I believe that was also in the supplemental brief. And so our position was that's not required in the context of this case because we're talking about prior testimony that was in a court case, and the rule in this particular context is the state, in order to authenticate that information, doesn't require an in-court identification of the defendant. It requires a time and place identification when that testimony occurred. Based on my reading of the record, it appears that defense counsel gave away that issue at trial because when the statement was read into the record, that was an agreed procedure, and defense counsel said something to the court of we don't want to require the state to have to authenticate this, so we've agreed to this procedure where they read it as a script. That may be possible. I'll look at the record. Yeah, because as you noted, it's been close to a year since I've seen this record, so I'm not 100 percent sure if that occurred or not. Sometimes we forget that when you're arguing in front of us, so I appreciate that both of you have a little bit of a time gap here. The other question that is front and center in my mind is was the prior statement that was read sort of as a script at the end of the trial, was that statement offered only for impeachment or as substantive evidence? My recollection is that it was essentially offered as impeachment evidence, but I think even if it was offered as substantive evidence, the United States Supreme Court case of NAMIC deals with this issue, and if it's being offered for substantive evidence, that's okay because as long as it's not being offered as the only evidence where the prosecutor is not relying solely on the defendant's silence before they offer that evidence in, they're giving the witness the opportunity to testify, and if the witness refuses, they then later went back and they did read it under what is essentially an impeachment procedure, and I do believe that the way the procedure worked out in court is that the state's attorney asked basically a summary of it. Was this your testimony? And then the witness remained silent, and then later after the witness had refused, it was essentially read as a script in the record. I believe so, yes. And that cross-examination aspect of it is. So that procedure, your point or your position is that was for purposes of impeachment, the procedure was in the nature of impeachment but not substantive? I believe it was in the nature of impeachment. And alternatively, in your brief, you addressed the substantive issue. Correct, under NAMIC. Because under NAMIC, I believe it's okay to bring it in as substantive evidence if the individual refuses to testify. It doesn't have to be for impeachment purposes. Let me derail your argument again. Sure. This jury did not find that Jackie Williams held the gun. And that was Spencer's testimony, that they came in the door and Williams held the gun. So is there a homicidal argument here that even if it was offered substantively, it's clear from this record that the jury didn't believe Spencer's version of the events? Well, I think that's absolutely clear, and that speaks to our cross-exam argument. Because, you know, the law requires you to get an opportunity to cross-examine. And the defendant in this case did cross-examine Spencer. And Spencer was very cooperative with defense counsel up until counsel tried to elicit testimony that was the hearsay testimony of Lily Mae Griffin, where he had threatened, you know, this is not the end of it to the victim a few weeks prior. And so with regard to the jury, I think it was clear that they were essentially impeaching defense counsel on cross-examination was destroying the credibility of Spencer. And part of the other reason why it is harmless, it was duplicative testimony. Because Katishi Warfield had already put the gun in the defendant's hand, aside from Spencer's testimony. I think the jury probably found that Spencer did not shoot, but he was armed, because they did find him guilty of attempt armed robbery, which would have required him to possess the weapon. But they couldn't determine from the testimony who shot the weapon. And I think DeMarco Spencer's testimony spoke to that issue and helped defense counsel as far as, you know, increasing his credibility when they impeached him like that. I think it's also – Was a second gun ever found? No, there was no other gun found. The gun that was found did match the description that Katishi Warfield had stated that was – when she was in the vehicle with Shelton and Spencer and the defendant, a black and brown handgun was passed to the defendant. And the gun that was found did match that description. It was a black and brown handgun. And what about the shell casings and things that were found? Was there any evidence that there was ever a second gun? I don't recall that the shell casings – I believe the casings that were found matched the gun that was fired. I don't know that there was ever any evidence that another gun was fired. There was evidence – Frankie Ratliff testified. He was one of the individuals who was in McCreary's home. He believed there was more than one gun. So it's possible that the defendant and Spencer were both armed, but it wasn't something he was certain of and he testified to. And Carolyn Crosswhite, the other individual who was in the house, didn't testify that she saw more than one individual with a gun. And so there's some evidence there may have been a second gun, but there's not – I don't believe there's evidence the second gun was fired. And I think the bullet that was removed from the victim did match the gun that was ultimately found to be the murder weapon in this case. Okay. I thought Ratliff's testimony was that both of them came in firing. It could be. I can't – I'm trying to remember how it was phrased when I was reviewing the statement of facts in my brief. It could have been. I'm not sure. I know he was the only one that testified there was more than one gun. If he testified that there was more than one gun fired, that's what he testified to. But if not, it's the only evidence that there was a second gun. I'm not sure about that either, but I thought that's what he said. This is a complicated record because it's been in front of us several times. I think there was a remand and a new trial. And I believe Justice McLean may have been on one of the earlier appeals. So we've read the facts of the prior trial. And we have to now sort out and ignore those facts and only focus on the current trial. Yeah, things can really meld together. And it's been a long time because these co-defendants have all served their terms. And Mr. Spencer also appealed his conviction, and I also think Justice McLean was on that case as well. So just trust that we're going to study this particular record. Oh, certainly. I have no doubt the court will do that. And that's some of the reason for the confusion up here. And it is a confusing case. There is a lot of moving parts. It was a large record. And these events happened, I think, in 2008 was the first series of trials. So this has been going on. And I shouldn't say confusion. I should say lack of clarity. We do get facts and stuff. I do, certainly, from appeal to appeal. So we'll study this record. I have one more question about the identification, authentication issue raised in the brief, the original brief that I read, and that is a bone of contention was the fact that Mr. Spencer, in his prior testimony, did not identify Mr. Williams because Mr. Williams wasn't in the courtroom for Mr. Spencer's trial. In this record, Mr. Williams' girlfriend, Catice, did identify Mr. Williams. How does that play into the identification and authentication issue? I think it plays into the identification, authentication issue because you're not required to identify the defendant under the context of the prior trial testimony coming in. And when they use that prior testimony, the common law rule that I cited in the case law is that the only thing that has to be authenticated for proper foundation is that you identify the time and the place, which the prosecutor in this case did. She said this was February of 2008 during your trial, and that's when this testimony occurred. I'm also not certain, you know— So for impeachment purposes, for impeachment purposes, you're only attacking the credibility of Mr. Spencer, and it has nothing to do with whether he identified Williams or not. Correct. Just whether he was a trial— Testified the same, yes. Correct. And if there are no further questions, we'll rest on our brief on the remaining issues. And if Your Honors would like, we would be willing to file supplemental briefing on any of the cases like the Williams case that was brought up. So with that, the people would ask that this Court affirm defendant's conviction and sentence. Thank you. Thank you. Ms. Ramos, any rebubble? Just a couple of quick things. So counsel was mentioning his reading of the Harris case as to the state, considering 18 the bright line for adulthood. I just wanted to mention a couple things from my reading of Harris. From my reading of Harris, I do remember it saying that the record was not sufficient to consider any of the young adult brain science issues in the Harris case. So from what I understand, that means that it's not something that could have been decided on Mr. Harris' direct appeal. The record was not sufficient for them to make that decision. And I believe that's why there are still cases moving through the pipeline, such as the Cordell Williams case, which I'm sorry I didn't mention that I would, of course, supplement for you as well, having going through the courthouses as they're building those records. In addition, I did want to mention, Your Honors were mentioning about Ratcliffe and the gun and how many guns were mentioned. In this trial, Mr. Ratcliffe did say that there were two guns. He is also the only witness that mentioned that there were two guns. I did want to confirm that for Your Honors. Do you have any other questions? Thank you. I appreciate your time. We thank both of you for your arguments this morning. We'll take the matter under advisement and we'll issue a written decision as quickly as possible.